Good morning, your honors. My name is Peter Giannini. I represent Judge James Shore, the petitioner. I am going to try to reserve three minutes for rebuttal. I'll see how well I do. Your honors, Mr. Shore did not get a fair trial. He was convicted by accomplice testimony corroborated by a jailhouse informant. Both the accomplices and the jailhouse informant committed perjury without the testimony of either the accomplices or the informant. He could not have been convicted. Mr. Shore's trial was not fair because the prosecution knowingly allowed perjury testimony and withheld material evidence about the informant and the accomplices that the jury was entitled to know in order to fairly evaluate their testimony. And I have listed several Knappaway violations and Brady violations, or at least three Knappaway violations, and that is the knowing perjury testimony of the jailhouse informant that he was not receiving any consideration for his testimony against Mr. Shore, and the knowing perjury testimony of each of the two accomplices that they were going to be spending years in the youth authority when, in fact, they knew at the time that they failed. They testified that they would not, and I believe that their lawyers knew it, and I believe that the prosecutor knew it at the time that they testified. They, in fact, did plead guilty the same day that they testified against Mr. Shore. Mr. Jim, may I ask you a question? As I look at the record, I don't see any preserved Brady claim with respect to Brady's involvement in the crime. I do see a preserved Matthew claim. I realize that this Court granted a certificate of appealability on the Brady issue, but I don't see how we could have done that providently if the issue is not, in fact, preserved. I don't know that it makes the slightest bit of difference to your position, but I just wanted to clarify it with you. I mentioned that in my reply brief, that we did raise in the district court that, as far as the accomplices were concerned, that there was a Knappaway issue of them testifying. Well, I think there's an accurate issue. I don't have to question that at all. But that's a good question.  I think that the prosecution was aware of that, and that implicit in that was the fact that they had the prosecution knew ahead of time that they had been given consideration, that they were not – that had not been disclosed. And the trial court was aware of it. And … He didn't rule on it. Well, he did rule on it. He said that – what he said was, I'm going to – he said, I find the jailhouse informant to be a pathological liar. I find that he committed perjury. Well, I'm not talking about Chambers. Excuse me. I'm not talking about Cisneros. Chambers is another infamous informant. Cisneros. I'm talking about Weathers and … Brangelo. Yeah, because … I understand. Because as to them, I don't believe there was Brady. As I said, I'm not sure it matters. I mean, I would think he would – his position would be it doesn't make any difference because he's still there. I think your point was that the – my point was that the superior court did address the aspect of Weathers and Brangelo and the fact that they were … Let's just put that aside. Let me follow up on the two accomplices only for the moment. Put Cisneros aside. Okay. As to them, why is the – why is the material that would have been known material? Because it's obvious in both cases that they got a staggeringly huge benefit. That is, they each were liable for a second-degree murder charge that carried a 15-year sentence in prison, which they traded off for no more than five years, and a California Youth Authority commitment. Now, sure, in her case, everybody – everybody should have known that she wasn't age-eligible. And in his case, they didn't know that he would be rejected or not. They may have figured that he probably would have been. But here's – the real point is, what real difference did it make since they knew they were getting a huge benefit? It just would have been great frosting on the cupcake, wouldn't it? Well, the difference between the – I mean, the fact that it was reduced from 15 years to five years was a … Well, and a huge difference between spending your time in a California correctional facility or spending your time at a California Youth Authority facility. I mean, it's a big, big, big difference. Well, I think recent – recent studies about what goes on in California Youth Authority and what it is – what it is like there … Well, I'm not saying – okay. I think you see my point, and I just wondered what your response was. Well, my response is that had it been known that they were five years, 15 years, it's still time in prison. It's still a lot of time in prison. And the difference between five years or 15 years in prison and walking out the door when you finish your testimony, that's a difference. That is – I mean, they would say anything to do that. And they were the only witnesses who had anything to say about the – about the percipient events that happened. There was no corroboration of anything that happened in terms of the actual crime itself other than – other than from them. The only people who identified people at the crime identified them. Nobody identified short. As far as the – the superior court made all these findings. It made the findings that this man was just a pathological liar. It made the finding that he had perjured himself and said I'm – and then used the wrong materiality standard and said, well, what I'm going to do is I'm going to toss out his – his testimony and see if there's any evidence left to convict him. That's the wrong standard. And the standard is, is there any reasonable possibility that the perjured testimony could have affected the jury? And the superior court made a finding exactly on that point and said it had to have affected the jury. But he used the wrong materiality standard. And then he went on and said, well, what that leaves us with is the – the issue of the deal for the accomplice witnesses. And – and that is for him. He says that is the – the crux of the case. And he says, and I find that the burden has shifted from the petitioner to the respondent to justify what they did in this case because the petitioner has made – has made an initial sufficient showing. And then inexplicably in – in the – in the minute order says – it's a one-sentence minute order. This is not a reasoned decision. This is a one-sentence minute order. Well, it is reasoned, but the reason is that the evidence at trial overwhelmingly convicted defendants. So the question for us, I think, is whether that is unreasonable under the Edpus standard to say that there was overwhelming evidence. It makes no sense. It makes no sense in terms of anything that the superior court had said in any previous hearing where the things that I – that I just said about what he said about the informer, what he said about the accomplices, what he said about the burden shifting. And then this is out of the blue. This is an unreasonable determination of the facts based upon the evidence presented at the – at the – at the hearings. I'm sure the Court is familiar with – with Jackson v. Brown and the – and the – and the progeny and the line of those cases where the Court analyzes the – the Napoli violations first. I don't understand why Jackson has anything to do with this case because it was a pre-Edput case. And we're not – we're bound by – in an Edput case to ask what the U.S. Supreme Court has said. Again, I don't understand it makes any difference to your position. Okay. But that's – what we've got to do is look to Bagley and Kiles and Nephew and – Absolutely. Absolutely. And the only reason that I find Jackson's helpful is that it discusses all those cases. And Jackson didn't discuss any new law. Jackson didn't make any new law. It – you think it – well, I mean, it certainly was consistent with Ninth Circuit, previous Ninth Circuit law, all of which – It still – it still may be different law from what the U.S. Supreme Court has said. Anyway. Bagley cited – Jackson cites Bagley repeatedly. Cites Kiles. Cites Giglio. Cites Napoli. Cites Brady. And – and it cites the correct standards for the – for the – for the differences in materiality, the differences in, you know, the Napoli violations under another Ninth Circuit case, which – Hayes v. Brown. Is any reasonable likelihood that the false testimony could have affected the outcome? I mean, you just can't say that it – that there is no likelihood that the false testimony of the – of the informant that the petitioner confessed to him that he – that he did it and why he did it when he was vouched for by the prosecutor who said in his closing argument, this is a – this is a confession. It gives a motive. And the prosecutor says, I personally think he is believable. And the – and the Superior Court found that this had to have had an effect on the jury. That's a – that's a clear Napoli violation. I am getting close to the end of my time. I'm going to try to reserve it, Eric. Thank you, Your Honors. And it's nice to see you again. Good morning, Your Honors. Deputy Attorney General Tom Schiff. I'm the offer respondent. Let me first address the issue of whether the L.A. Superior Court's December 2, 1991, minute order was a reasoned opinion. It's clear, based on the language that the Superior Court used, it referred to overwhelming evidence. And then after that – Well, look, let me ask you this. I assume it's a reasoned opinion. But whether we review it independently or whether we review it somewhat deferentially, how can that bottom line stand up? Given – given the fact that Cisneros – there is no question about the falsity of his testimony. He admitted it. It is false from – from beginning to end. It's not unimportant because it was a confession. And there is no more powerful evidentiary tool for the prosecution than a confession. Weathers – Dunn's testimony is essentially worthless. She was all over the face of the map and loaded beyond belief and had a self – and had an interest in trying to get it short rather than her boyfriend's sister. The bullets, while consistent with the kind of bullet that was the fatal bullet, there's no other significant evidence that connects the bullet with them. I mean, it's just consistent. But they're all over L.A. and they can be used in all sorts of guns. The bottom line being, it seems to me, this is one of those cases where it's almost inescapable  and I have neglected to mention that the accomplices obviously were very self-interested and they, too – their testimony, too, was subject to question, even if it – if standing alone it would save the verdict. With my colleague's permission, I want to add one more thing before – which is that the jury asked for a reread of Cisneros' testimony. So it's clear, even beyond just normal logic, that it was important in the decision-making process. Your Honors, let me try to address these issues in turn. I think I did address all of the concerns in our briefs, but let me highlight some points here. First, as – in just talking just strictly as to the McGooey claim as to Cisneros' testimony, that he didn't – that he – his low term that he was getting in the pending case had nothing to do with his testimony against Petitioner. As to that specific violation, there's several reasons why the – that that testimony, that Cisneros' testimony could not have affected the verdict. And let me first – Justice, you're moving away from the central point of the question that Judge Reimer and I sort of collectively have asked you, which is Cisneros said, this defendant confessed, but that was false. This defendant didn't confess, or if he did, no one witnessed it and no one testified about it except this guy lying. And so I think you need to face that specifically and not the peripheral things about whether he was or wasn't getting a benefit. As to that specific issue, as argued more fully in the briefs, adoptive admissions are essentially a confession. And here he made several – Petitioner, through his actions and his words, made several essentially what were adoptive admissions. And I think even Jackson v. Brown talks about – There were lies. I'm sorry, I don't understand what you're saying. What I'm referring to is Dunn and Salt both testified that they overheard Petitioner making threats that he – let me – Well, now back – we're off on a detour. I mean, the point is Cisneros said he asked Short whether anything would be found in the car. Short said no because Vence got rid of it all and poured battery acid in the car. He asked Short, he said, why did you do it? And Short said, I killed him because I didn't want to have any witnesses. I mean, and that was a lie. It was fabricated from beginning to end. Yes, and there's two points I want to make. First is that, as pointed out by the district court, the circumstances of that confession, it just was incredible. I don't think any jury would have believed him. Well, then why did they ask for a readback? I mean, what you're saying is that the most – really the only clear evidence in the case that unequivocally tied this defendant to this crime, the only direct piece of evidence, couldn't have had any effect on the verdict. That doesn't make any sense. Your Honor, I respectfully disagree with you. And I think the key point here is that Cisneros was not the key witness. He was not the crucial witness. The key witnesses were Weathers and Frangelo. Well, it's interesting because the prosecutor has a memorandum to file. It was dated May 28, 1981, that says that his case turns on Cisneros, that without Cisneros, he has no case. Right, because the other witnesses were either self-interested or intoxicated at the time. Again, let me – A unique Cisneros testimony. Well, first let me address Cisneros, and then I'll return to Weathers and Frangelo. But as to Cisneros in closing argument, the prosecutor in talking about Cisneros to the jury basically said that Cisneros was only important as – because he corroborated the testimony of Weathers and Frangelo. In the prosecutor's closing argument, the witnesses he emphasized were Weathers and Frangelo, not Cisneros. And in terms of corroboration, under California law, corroboration can be slight. And the prosecutor noted some other evidence that corroborated Weathers and Frangelo. But that's – the test now, having a conviction in hand, is not whether the case was sufficient as a matter of law to go to the jury because there was slight corroboration somewhere. The question is, what effect, in hindsight, do we think that it had on the actual verdict in the trial as it unfolded? So I don't think any of our questions are designed to say, well, without him, you couldn't have gone to court as a legal matter. But rather, without him, you wouldn't have won, which is a different – or it's very likely that you wouldn't have, which is a different inquiry. Your Honor, you're entirely correct that the question here is, what impact did Cisneros' testimony have on the jury? And first of all, he clearly was not a believable witness. And even the prosecutor acknowledged to the jury that if you don't believe him, that doesn't – we still have – the rest of the case is still enough to convict him. Actually, it's interesting, as an aside, that the prosecutor misrepresented what the testimony was to the jury because the prosecutor said that Cisneros overheard that conversation. And that's not what he testified to. What he testified to is that he interjected himself into it and elicited that comment. Contrary, of course, to what he had told the investigators to begin with, which is what the prosecutor referred to. Responding to the aside, I think attorneys often argue to the jury that their recollection of the evidence might not be correct and that they should turn to the evidence. But apart from that aside, turning back to Cisneros, there's three reasons why Cisneros' testimony could not have affected the jury's verdict. And first is that he wasn't credible. There was extensive evidence presented at trial regarding his criminal background, including that he had three prior felony convictions, that he had a prior burglary conviction that was reduced to misdemeanor. In addition to that, there was evidence that in, I believe it was 1973, that he was found to be a mentally disordered offender and that he was sent to the Atascadero State Hospital. So based on his criminal background, based upon the fact that he is a mentally disordered offender, his credibility is already suspect. Why isn't his credibility significant in the context of the co-defendants or co-conspirators, whatever you want to call them? Because the jury would have believed that finally here is an independent, disinterested witness, or that's the impression they had, because he was not involved in this particular crime. He was sort of a bystander. Why wouldn't he be key for that reason? Some responses there were, again, in addition to his lack of credibility, he already was impeached at trial. Basically, he testified regarding that he got no term deal, or essentially there's evidence that he cooperated in three cases, one of which was in the current case, which he denied. But there's also testimony, he testified that as to a 1979 case, that he testified that he didn't get anything in exchange for testifying against another defendant in that 1979 case. And what happened was Petitioner's trial counsel presented Cisneros' prior attorney, his last name was Webb, and Webb basically testified. He denied, he said that Petitioner was wrong, that Petitioner actually did get, I mean, I'm sorry, Cisneros actually did get a deal. And then in addition to that, there's evidence that Cisneros, at the time of Petitioner's trial, had offered cooperation in another case. So the jury essentially is aware that Cisneros is a serial informer, that this is the third case in which, that there's at least three cases in which he's offered, which is he's presented testimony against other defendants, three including the current one. So aside from Cisneros' credibility issues, his criminal background, the fact that he was impeached at trial regarding that 1979 case. In addition to that, as noted by the district court, the circumstances of basically Cisneros' version of what happened was unbelievable. Because under Cisneros' version, the conversation took place when Cisneros was behind a driver of the jail prison bus, there's a deputy sheriff a few feet away, and it just wasn't believable. And in addition to, aside from those issues regarding Cisneros' lack of credibility, the second point is that, again, Cisneros was not the key witness in this case. The key witnesses were Weathers and Frangelo. It was Weathers and Frangelo who testified regarding when the crime took place, where it took place, that they acted together in formulating this plan to go commit a robbery. And it's clear that Weathers and Frangelo were the key witnesses. One, regarding the readback issue, as I pointed out in our briefs, the jury asked for essentially three things. One was readback of Weathers' testimony. And according to the trial court, and I believe it was also the defense attorney, there were problems hearing her, they played back a tape of Weathers' interview with the police. And essentially, based on statements from the trial court and the defense attorneys, the reason that was readback was because there was problems hearing the tape. And then the other thing that was requested, I believe, was the testimony of, I think it was the woman who found the body. And basically, essentially, they also asked, I think it's entirely, in asking for that readback, that doesn't definitively show that the jury credited Cisneros or believed it was important. And our view, certainly, is that if you look at the items that were requested for readback, these were not issues that were, these were not crucial issues, and it's more in a line of trying to tie up loose ends in the case. Aside from that, the evidence at trial, clearly, again, the main evidence was the testimony of Weathers and Frangelo. But that was also corroborated by the testimony of James Saltz and Karen Dunn, and both of them testified that Petitioner threatened Weathers. Saltz also testified that Petitioner threatened them. Dunn testified that she saw Petitioner washing blood off his hands, or his clothes, and Petitioner saying something about there being one less Mexican. So, and Dunn, Saltz, Weathers, and Frangelo all testified that Petitioner participated in cleaning up the van. So, based on Petitioner's actions, his threats, those essentially were confessions as well. And so, Cisneros was not the only person that testified as to a confession. And specifically, addressing the bullets, it was GECO, G-E-C-O, GECO brand 25 caliber bullets. And it happens to be, that was the same brand and type of bullet was found in the victim's body. And four of those bullets were found in Petitioner's residence. And in addition to that, linking him to the crime, Saltz also testified- It wasn't his residence alone, though. Yeah, I'm sorry? It wasn't his residence alone. That's correct. He shared it with his wife in his purse, the bullets. It was found in her purse, that's correct. But in addition to that, Saltz also testified that about two weeks prior to the murder, that Petitioner showed him a Raven brand semi-automatic pistol. And these bullets were, there's evidence that's represented that these bullets were consistent with that gun. And I'm not entirely sure what part of the firearms expert evidence was stricken, but he did testify that in his six and a half years' experience, that he had never come across a GECO brand ammunition. And- I think that went out, but- Yeah, so I'm not entirely sure whether that particular portion was in there, but I did want to note that as well. Thank you very much. Your time is expired. I have about 40 seconds, according to- You're about 40 seconds in deficit. Oh, that's a deficit. Okay, I, I, I, I'm reading wrong. But, and the final point I want to make, with this Court's permission, is that this test here is under the AEDPA. We understand that, Mr. Chairman. Okay. Thank you, Your Honors. Thank you. Mr. Cheney. Your Honor, unless you have questions of me, it's clear the Court understands the issues. I don't have any rebuttal. Do you have anything else? I have no further questions. Okay. Thank you, Mr. Cheney. Thank you. Thank you, counsel. The matter just argued will be submitted, and the Court will take a very brief recess before hearing the last matter on calendar. Thank you, Your Honor. All rise. The Court will take a brief recess. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.    Thank you. Thank you. Can we get a vote, please? Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Rymer, Graber, Aldrich